242

**PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK,** Petitioner,

v.

**FEDERAL POWER COMMISSION,** Respondent,

Continental Oil Company and Sunray D X Oil Company, Skelly Oil Company, Sun Oil Company, George F. Coates, Prado Oil & Gas Company, Philadelphia Electric Company, Intervenors.

**CONTINENTAL OIL COMPANY,** and Sunray D X Oil Company, Petitioners,

v.

**FEDERAL POWER COMMISSION,** Respondent,

Public Service Commission of the State of New York, The United Gas Improvement Company, and Long Island Lighting Company, Intervenors.

The **UNITED GAS IMPROVEMENT COMPANY** and Long Island Lighting Company, Petitioners,

v.

**FEDERAL POWER COMMISSION,** Respondent,

Sun Oil Company, South Texas Natural Gas Gathering Company, George H. Coates, Skelly Oil Company, Continental Oil Company, et al., Prado Oil and Gas Company, and Philadelphia Electric Company, Intervenors.

**PRADO OIL AND GAS COMPANY,** Petitioner,

v.

**FEDERAL POWER COMMISSION,** Respondent,

Public Service Commission of the State of New York, Intervenor.

Nos. 17582, 17627, 17628, 17859.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 25, 1963.

Decided Jan. 23, 1964.

Certiorari Denied June 8, 1964.

See 84 S.Ct. 1644, 1646, 1649.

Mr. Kent H. Brown, Albany, N. Y., with whom Mrs. Barbara M. Suchow, New York City, was on the brief for Public Service Commission of the State of New York, petitioner in No. 17582 and intervenor in Nos. 17627 and 17859.

Mr. Thomas H. Burton, Houston, Tex., with whom Mr. Bruce R. Merrill, Houston, Tex., was on the brief, for Continental Oil Co., petitioner in No. 17627 and intervenor in Nos. 17582 and 17628.

Mr. William T. Coleman, Jr., Philadelphia, Pa., with whom Mr. W. Howard Dilks, Jr., Philadelphia, Pa., was on the brief, for United Gas Improvement Company, petitioner in No. 17628 and intervenor in No. 17627.

Mr. J. Evans Attwell, Houston, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Mr. W. D. Deakins, Jr., Houston, Tex., was on the brief, for Prado Oil and Gas Co., petitioner in No. 17859 and intervenor in Nos. 17582 and 17628.

Mr. Peter H. Schiff, Atty., Federal Power Commission, with whom Messrs. Richard A. Solomon, Gen. Counsel, and Howard E. Wahrenbrock, Solicitor, Federal Power Commission, were on the brief, for respondent.

Mr. Sherman S. Poland, Washington, D. C., with whom Mr. Lewis Carroll, Washington, D. C., was on the brief, for Skelly Oil Co. and George H. Coates, intervenors in Nos. 17582 and 17628.

Mr. Dale E. Doty, Washington, D. C., was on the brief for Sunray D X Oil Co., petitioner in No. 17627 and intervenor in Nos. 17582 and 17628.

Messrs. Robert E. May, Omar L. Crook, John T. Ketcham, Washington, D. C., and John A. Ward, III, Philadelphia, Pa., were on the brief, for Sun Oil Co., intervenor in Nos. 17582 and 17628.

Messrs. David K. Kadane and Bertram D. Moll, Mineola, N. Y., were on the brief for Long Island Lighting Co., petitioner in No. 17628 and intervenor in No. 17627.

Messrs. Bradford Ross and Lewis Carroll, Washington, D. C., were on the brief for South Texas Natural Gas Gathering Co., intervenor in No. 17628.

Mr. Eugene J. Bradley, Philadelphia, Pa., entered an appearance for Philadelphia Electric Co., intervenor in Nos. 17582 and 17628.

Before FAHY, WASHINGTON and DANAHER, Circuit Judges.

FAHY, Circuit Judge.

Continental Oil Co. and Sunray D X Oil Co., petitioners in No. 17627, and Prado Oil and Gas Co., petitioner in No. 17859, on May 15, 1959, and June 30, 1960, respectively, entered into contracts with the South Texas Natural Gas Gathering Company for the sale of natural gas at a price of 16 cents per Mcf. This was part of a larger project involving sales by numerous other gas producers in Texas Railroad District No. 4 to South Texas, to be delivered to Transcontinental Gas Pipe Line Corporation, for resale in interstate commerce. Applications for approval by the Federal Power Commission of sales of the petitioning producers were first filed between May 1959 and January 1960. However, even before notice of these applications had been issued *ex parte* temporary certificates had been granted to most of the producer-applicants authorizing the immediate commencement of the sales at contract prices ranging from 9 to 17 cents per Mcf. None of these certificates provided for any refund should the contract prices subsequently be found to exceed the proper "in-line" price for the area.

After a hearing on the applications the Commission on November 22, 1960, approved the producers' proposed prices. The Public Service Commission of the State of New York, petitioner in No. 17582, sought a rehearing, contending that the proper "in-line" price for the particular area was 14.6 cents per Mcf. The Commission granted a rehearing and consolidated the above applications with thirty-five additional producer applications relating to the same project. Like the producers involved in the first stage of the proceedings these additional producer-applicants had been granted temporary operating certificates containing no refund provision. Hearings were once again held and on January 25, 1962, the Presiding Examiner issued his preliminary statement approving the proposed sales at prices ranging from 16 to 17 cents. In doing so he relied heavily on the Commission's Statement of General Policy No. 61–1, issued September 28, 1960, in which, as a part of its area pricing policy, the Commission had set the area price for Texas Railroad District No. 4, the origin of the gas, at 18 cents per Mcf.

On August 30, 1962, the Commission issued its own final decision in which it found that the "in-line" price for the area with respect to contracts entered into prior to September 28, 1960, was 15 cents per Mcf.[1] Accordingly, it approved the sales in question on the condition that the price charged be not in excess of 15 cents.[2] It refused, however, to order a refund of the charges in excess of 15 cents collected under the temporary authorizations. The Commission was initially of the opinion that since no refund provision had been included in the temporary certificates there was "no basis for ordering refunds." In its later order of December 18, 1962, denying reconsideration, the Commission explained that it would be inequitable to require refunds when the temporary certificates contained no provision clearly apprising the producers of the risk in operating under a temporary certificate subject to a refund obligation.

In its final orders the Commission also declared that the provisions in the sales

1. Of eighty-six related applications originally involved in the Commission proceedings only fifteen proposed contract prices were found to be "out of line"; and of the twelve producers whose certificates were conditioned by the Commission on a price reduction all but three, Continental, Sunray and Prado, have apparently accepted the Commission's ruling by not filing a petition for review. However, Sunray and two other producers have filed a separate petition contesting similar Commission action and by stipulation have agreed to be bound by the final disposition of these cases.

2. Simultaneously with this order the Commission issued its Fifth Amendment to Statement of General Policy No. 61–1 in which it reduced the area ceiling price level for Texas Railroad District No. 4 from 18 cents per Mcf. to 16 cents per Mcf.

contracts obligating the purchaser to take or pay for a minimum volume of gas on an annual basis were subject to the Commission's final order in a pending rule making proceeding concerning "take or pay" provisions. The Commission subsequently modified this condition so that the producers would not be required to file "take or pay" provisions for less than eighty per cent of the annual contract quantities, regardless of the outcome of the rule making proceeding.

The producer petitioners in Nos. 17627 and 17859 seek review of the orders insofar as they condition approval of the proposed sales (a) on a reduction in the initial price to 15 cents and (b) on the outcome of the rule making proceedings regarding "take or pay" provisions. Petitioners in Nos. 17582 and 17628 seek review of the same orders insofar as they omit to require a refund of excess charges collected under the temporary certificates. Intervenors in Nos. 17582 and 17628 support the Commission in refusing to order refunds.[3]

### The Fixing of An In-Line Price of 15 Cents as a Condition to the Permanent Certificates

The Commission was obliged to be guided by Atlantic Refining Co. v. Public Serv. Comm., 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959), known as the Catco decision. The Court there pointed out that some of the provisions of the Act regarding rates, notably Sections 4 and 5, entail extremely long delays, call-

ing upon the Commission in Section 7 proceedings to condition certificates by requiring an "in-line" initial price. Accordingly, in granting permanent certificates the Commission is to decide the "in-line" price. This the Commission did in the present cases, fixing it as of the date of the contracts under which the gas was to enter interstate commerce. It determined that the appropriate price for District No. 4 revolved around the situation prevailing there in the years 1958, 1959 and 1960. It considered as the most important evidence a study prepared by the Commission staff analyzing contract and price data for the years 1955 and later. Of the contracts thus analyzed none executed during the 1958 to 1960 period and under permanent certificates involved prices above 18 cents and the majority, involving also the greater volume of gas, were at prices between 14 and 15 cents. And the Commission noted that it had granted certificates for sales in the area during the three years mentioned at prices ranging down to 6 cents per Mcf.[4] In addition, as the opinion points out, nearly all the contracts with prices above 15 cents were subject to litigation. Being under a cloud they were eliminated from consideration. The Commission also placed under the same cloud, or in a suspect category, other contract prices above 15 cents which, though not themselves in litigation, appeared because of the higher prices to be subject to the same infirmities as those which were. The Commission also gave less consideration to prices

3. In No. 17628 intervenor The South Texas Natural Gas Gathering Company refers to a statement in the brief of petitioners in that case regarding the absence of a provision in its certificate for a "flow-through" of refunds. South Texas states it would agree voluntarily to pass along refunds should they result from this review proceeding, on the condition that petitioners and other customers of Transcontinental Gas Pipe Line Corporation agree that such refunds will be immediately and completely passed along by them to the ultimate consumers so that petitioners and other customers of Trans-

continental would not receive a windfall as the result of South Texas' action.

4. Continental contends this finds no support in the record. In its opinion on reconsideration the Commission adequately meets this objection by pointing out that the notice it took of prices ranging down to 6 cents "was not a part of the decisional process in determining the line but merely part of our explanation of the scope of the staff exhibit, which treated sales at prices of 14 cents and above. Therefore further evidence on this matter would not affect the basis of our decision."

allowed under temporary certificates than under permanent certificates, because the former were issued ex parte and informally, without full investigation.

It cannot be seriously contended that the data upon which the Commission relied fails to support its determination of an "in-line" price of 15 cents. It is principally urged that the Commission erred in limiting, as above indicated, the evidence upon which it relied. We now consider these limitations.

■ As to the exclusion of prices under a cloud the Commission has the support of the opinions of the courts in United Gas Improvement Co. v. F. P. C., 283 F.2d 817, 824 (9th Cir. 1960), cert. denied sub nom. Superior Oil Co. v. United Gas Improvement Co., 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191, and California Co. v. United Gas Improvement Co., 365 U.S. 881, 81 S.Ct. 1030, 6 L.Ed.2d 192 (1961), and United Gas Improvement Co. v. F. P. C., 290 F.2d 133, 137 (5th Cir.), cert. denied sub nom. Sun Oil Co. v. United Gas Improvement Co., 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961), and see our opinion in Pub. Serv. Comm. v. F. P. C., 109 U.S.App. D.C. 292, 295 n. 3, 287 F.2d 146, 149 n. 3 (1960), cert. denied sub nom. Hope Natural Gas Co. v. Pub. Serv. Comm'n, 365 U.S. 880, 81 S.Ct. 1031, 6 L.Ed.2d 192, and Shell Oil Co. v. Pub. Serv. Comm, 365 U.S. 882, 81 S.Ct. 1030, 6 L.Ed.2d 192 (1961). In the light of these authorities we do not sustain the challenge advanced on this ground. In any event the exclusion of the prices under a cloud does not undermine the validity of the "in-line" price determined by the Commission, considering the evidence in its entirety.

■ The producer-petitioners make special objection to the Commission's refusal to rely upon a number of sales at 16 to 17 cents made in 1955 and 1956 to the Coastal Transmission Corp. Since the Coastal sales were made before the 1958 to 1960 period when the contracts in the present cases were entered into and since the majority of the subsequent sales in Texas Railroad District No. 4 were at less than 15 cents, the Commission could reasonably determine as it did that the Coastal sales did not establish a valid line of 16 to 17 cents for that area during the 1958 to 1960 period.

The Commission also pointed out that "the earlier Coastal sales were made to a new company that had neither been given a certificate nor was yet in operation, so may have resulted in higher prices than would have resulted from contracts with an established pipeline." The Commission substantiated this observation on appeal by pointing out that the staff exhibit showed for the 1955–1956 period when the earlier Coastal sales were made that other sales, involving a greater volume of gas, were made to a more established pipeline at prices below 15 cents.

■ Continental contends that the Commission erred in not considering certain costs and financial requirements, evidence with respect to which was presented to show the amount Continental would be required to receive to recoup its cash outlay with respect to one area of its production here involved, and in failing to consider evidence as to the industry's replacement costs of gas, submitted by Texaco [5] and adopted by the other producers. However, these are not rate cases of the type in which evidence of this kind ordinarily is considered relevant. These proceedings under Section 7, considered with the Catco decision, permit the Commission to fix the "in-line" price, not on a basis of cash outlay or replacement costs, but on the basis of the price level established by comparable sales contracted for by those placing gas in the area in interstate commerce. The standards of Sections 4 and 5 are not those to be used in conditioning a certificate issued under Section 7; otherwise the purpose of Catco to avoid the consequences of the well nigh interminable proceedings incident to a rate

5. The contention in this regard is made by Prado as well as Continental.

case would be defeated. See, for example, United Gas Improvement Co. v. F. P. C., supra, 283 F.2d at 823. Consideration of the proffered evidence was not essential. In so deciding we need not hold that the Commission may never consider such evidence if the circumstances in a particular case move it to do so consistently with its obligations under *Catco.*

■ Prado contends in No. 17859 that the Commission failed to give adequate consideration to its own Statement of General Policy No. 61–1, as amended, issued September 28, 1960. By this Statement the Commission prescribed guide line initial prices for twenty-three producing areas. It said that in doing so it considered many factors, including cost information from all decided and pending cases, existing and historical price structures, volumes of production, trends in production, et cetera. The guide line initial price for Texas Railroad District No. 4 was 18 cents per Mcf. Thereafter, on August 30, 1962, concurrently with its opinion in No. 362, presently before us, the area initial price for said District was lowered to 16 cents per Mcf. Prado contends that the action of the Commission in conditioning the permanent certificates at a price level below either the 18 cents or 16 cents guide line price is arbitrary and discriminatory. But the area guide line price is only a guide line price; it is not an "in-line" price required by *Catco* to be determined with the issuance of permanent certificates under Section 7(c). As the Commission states, its Policy Statement was a guide to its future action and "cannot effect an automatic approval of proposed rates, particularly where the contracts were entered into before the Policy Statement." The Commission could not have ignored altogether its own Policy Statement, but it was not required to be controlled thereby in deciding, in the Section 7 proceedings, that the in-line price should be fixed at a less amount on the basis of the evidence analyzed in its opinion.

■ A somewhat related contention is that the Commission erred in fixing the "in-line" price as of the date of the contracts rather than as of the later date of initial delivery of gas. The Commission answers that the execution of a contract is the significant act of a buyer and seller in determining price, and that the effect of this determination does not await deliveries. We think we must honor the discretion thus exercised by the Commission "to require that the gas sold be sold under contracts that were in-line as of the time they were executed," to adopt its language. The Commission cites United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), to the effect that rates are established initially by the companies by contract or otherwise. The Commission apparently made no general rule for all cases, for its states that "under the circumstances here" the contract prices must be in line as of the time the contracts were executed.

■ None of the attacks on the "in-line" determination gives the court a basis for holding it to be invalid; and since the data relied upon adequately supports the price condition of the permanent certificates such condition is approved. Contracts under permanent certificates at prices of not more than 15 cents, covering such a large volume of gas from the same area, and for the years which are most relevant, are so numerous that we cannot say that the Commission exceeded its authority in fixing the "in-line" price at 15 cents, notwithstanding its refusal to give significant consideration to higher prices for earlier years, even though under permanent certificates.

### The Take-Or-Pay Provision

The original condition in this regard reads:

The certificates of all of the producer applicants * * * shall be conditioned so that the take-or-pay requirement in each contract is subject to the provisions of our final

order in Docket No. R–199 as of the effective date of that order.

As we have said, in its decision on reconsideration the Commission modified this provision to read that "the producers shall not be required to file take-or-pay provisions for less than 80 per cent of the annual contract quantities."

Docket No. R–199 is the general rulemaking proceeding to consider standardization of take-or-pay provisions in producer contracts. Any modification of such contracts which might be required as a result of the proceeding would be prospective only. Should the producers here involved be required to file modified provisions they could then obtain review. See Midwestern Gas Transmission Co. v. F. P. C., 292 F.2d 119 (5th Cir. 1961). The present impact of the proceeding in Docket No. R–199 is too tenuous and uncertain to require the court to pass now upon the validity of what might eventuate, or to hold invalid pursuit of the matter by the Commission. To do the latter would be to say that no modification of the questioned provisions can be validly accomplished. And to do this now would be to rule in the dark.[6]

### The Refund Issue

Petitioners, Public Service Commission of New York, United Gas Improvement Company and Long Island Lighting Company, intervenors before the Commission, contend in Nos. 17582 and 17628 that the Commission is under legal obligation to require as a condition to its grant of permanent certificates that the producers refund that portion of the charges they have collected under temporary certificates in excess of the maximum initial price found by the Commission to be required by the public convenience and necessity.

We consider first the producers' contention that the issuance of the tempo-

rary certificates were appealable orders and that the failure of petitioners in Nos. 17582 and 17628 to seek review thereof precludes the relief they now seek, citing Texaco, Inc. v. F. P. C., 290 F.2d 149, 156–157 (5th Cir. 1961). But there the challenged conditions were in the temporary certificates. The Court held that if those conditions were deemed to be invalid the question should have been raised before the challenging producers accepted the certificates. "This is true because the failure of petitioners to appeal from the order granting the conditions within the time provided for appeals in Section 19(b) of the Natural Gas Act * * * deprives this court of jurisdiction to entertain a petition to review this order. Clearly, the order granting the temporary certificates, when it embodied the conditions now complained of was an order which then aggrieved the petitioners." 290 F.2d at 156–157.

The situation here is significantly different. It is true the present petitioners in a loose sense may be said to have been aggrieved by the absence of a refund condition in the temporary certificates, for such a condition would have strengthened their position; but in a jurisdictional sense their aggrievement is with the absence of a refund requirement in the permanent certificates over which we now have jurisdiction. Once this absence became final before the Commission timely review was sought. In this situation we think it is open to petitioners to obtain now a decision on the refund issue.

Coming to the merits the producer intervenors say a refund condition is beyond the Commission's statutory power. As to this we may say initially that our statement in Atlantic Ref. Co. v. F. P. C., 115 U.S.App.D.C. 26, 316 F. 2d 677, 679 (1963), that there is no

---

6. Petitioners in No. 17627 attack the validity of the Commission's Fifth Amendment to its Statement of General Policy No. 61–1. However, in determining the validity of the orders under review we need not probe the validity of the Amendment; and there is no occasion now to pass upon the Amendment independently of those orders.

mechanism for refund of overcharges under Section 7 is not a holding that a refund may never be required when a permanent certificate takes over from a temporary one, an issue not there considered.

■ The producers argue that in any event refunds may not be required because the Commission lacks power "to set retroactive rates or award reparations," citing Hope Natural Gas Co. v. F. P. C., 134 F.2d 287, 309–310 (4th Cir. 1943), rev'd on other grounds, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). But there the Court was referring to the power of the Commission with respect to rates which had become unconditionally effective when filed, subject to being changed only prospectively in a proceeding under Sections 4 or 5(a) of the Act. The Court was not ruling upon the power of the Commission to condition a permanent certificate by requiring refunds of excessive prices charged and received under temporary certificates.[7] We think it is clear that a refund can be required when the temporary certificate is so conditioned. The serious question is whether it can be required when the temporary certificate is not so conditioned.

As to this the Commission itself, though it did not require refunds in these cases, does not disclaim the power. The basic purpose of the Natural Gas Act is consumer protection from unreasonable prices, and refund of excessive utility rates is a well recognized remedy. It would need to be quite clear from the Act that the Commission lacked the power to use such a remedy for the courts to deny it. We find no such clarity. The power does not depend upon an explicit refund provision in a temporary certificate. Should the occasion be appropriate for its exercise the power resides in the Commission when it grants a permanent certificate. To hold that it may not then require refund of excessive prices previously permitted without notice or hearing or mature consideration, since the Commission acted on an emergent and temporary basis, would be inconsistent with the regulatory responsibility of the Commission to aid in the ascertainment and authorization of just and reasonable rates.

Section 7(e) provides, "The Commission shall have the power to attach to the issuance of the certificate * * * such reasonable terms and conditions as the public convenience and necessity may require." 56 Stat 84 (1942), 15 U.S.C. § 717f(e) (1958). And the temporary certificates before us provide:

"This acceptance for filing shall not be construed as constituting approval of any rate, charge, classification, or any rule, regulation or practice affecting such rate or service contained in the rate filing; nor shall such acceptance be deemed as recognition of any claimed contractual right or obligation associated therewith; and such acceptance is without prejudice to any findings or orders which may be made in the final disposition of this proceeding or any other findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against your company.

\* \* \* \* \* \*

"This constitutes all requisite temporary authorization to commence the sale of gas, but such authorization and acceptance of the rate schedule are without prejudice to such final disposition of the certificate application as the record may require and, furthermore, once service is commenced under this authorization it may not be discontinued without permission of the Commission issued pursuant to the provisions of the Natural Gas Act."

These provisions, all else aside, amply support authority for conditioning the

---

7. As to the power see Texaco, Inc. v. F. P. C., 290 F.2d 149, 156 (5th Cir. 1961); Pure Oil Co. v. F. P. C., 292 F.2d 350, 352–54 (7th Cir. 1961). Compare, however, Sunray Mid-Continent Oil Co. v. F. P. C., 270 F.2d 404 (10th Cir. 1959).

permanent certificates by a refund requirement. As we have indicated, to order refund of rates found to be excessive is not an unusual remedy; and it is not unavailable under the Natural Gas Act due to the fact that in some instances the parties are not explicitly notified early in the proceedings that such a remedy may be imposed.[8]

■ The existence of the power, however, does not mean that its exercise is mandatory, as petitioners in Nos. 17582 and 17628 assert. Here we follow the standard adopted by the Commission, namely, the standard of equity—that is, the issue of a refund in the present circumstances turns upon equitable considerations. But we do not follow the Commission in holding also that the sole and decisive equitable consideration here is the absence of a refund requirement in the temporary certificates. That would amount to saying that in the absence of such a condition in the temporary certificates refunds may not be required, a position we cannot accept. We recognize the Commission's duty to consider the extent to which a refund obligation in the absence of prior warning will, by increasing the risk producers must bear, affect the quantity and continuity of the supply of gas and thus have an adverse effect on the interests of consumers. But there are public interest factors of equity which must be weighed along with the effect of mere absence of a refund condition in the temporary certificates.

One of these is the very fact that excessive prices were obtained while the proceedings pended, and after it was known an "in-line" price above 14.6 cents was being protested. See note 8 *infra.* The public interest, as represented by the consumer interest, is not necessarily, or entirely, offset by the absence of an explicit refund condition in the temporary certificates, especially when those certificates contained the general conditions to which we have hereinabove referred. We do not attempt an enumeration of all equitable considerations involved. These are better left for at least initial Commission consideration in all the circumstances. We do hold, however, that the mere absence of the condition in the temporary certificates is insufficient to cast the full burden of excessive charges upon the consuming interests. There must be, with the assistance of the parties, a broader and more penetrating analysis and consideration of the factors pro and con a refund, and its amount or extent, in arriving at an equitable conclusion.

The refund issue requires further development and fuller consideration of the equitable factors other than those thought to flow from the mere absence of an explicit refund condition in the temporary certificates.

Nos. 17627 and 17859 affirmed.

Nos. 17582 and 17628 remanded for further proceedings consistent with this opinion.

8. The producers rely upon the Tenth Circuit's decision in Sunray Mid-Continent Oil Co. v. F. P. C., 270 F.2d 404 (1959). The Court there held that even in attaching a refund condition to a temporary certificate the Commission must limit it by setting a price at or below which the producer can sell without risk of a subsequent refund order. The Court felt that without such a limit on the refund obligation the Commission's grant of temporary authority was too vague to allow the producer to decide intelligently whether to accept the Commission's conditional grant and thereby commit its gas reserves to interstate commerce.

To the extent that our decision may be inconsistent with *Sunray* we are constrained respectfully to disagree with the latter. Moreover, it should also be pointed out that as a practical matter the producers in this case were relatively assured of being able to sell their gas without risk of subsequent refund at a price of 14.6 cents per Mcf., the price which PSC and the other consumer interests originally urged as the proper in-line price.