UNITED GAS IMPROVEMENT CO. ET AL. *v.*
CALLERY PROPERTIES, INC., ET AL.

No. 21.   Argued October 18–19, 1965.—Decided December 7, 1965.*

---

*Together with No. 22, *Public Service Commission of New York* v. *Callery Properties, Inc., et al.,* No. 26, *Ocean Drilling & Exploration Co.* v. *Federal Power Commission et al.,* and No. 32, *Federal Power Commission* v. *Callery Properties, Inc., et al.,* also on certiorari to the same court.

224

*Richard A. Solomon* argued the cause for the Federal Power Commission. With him on the brief were *Acting Solicitor General Spritzer, Howard E. Wahrenbrock, Robert L. Russell* and *Josephine H. Klein.*

*William T. Coleman, Jr.,* argued the cause for United Gas Improvement Co. et al., petitioners in No. 21 and respondents in No. 26. With him on the briefs were *Samuel Graff Miller, Richardson Dilworth, Harold E. Kohn, Bertram D. Moll* and *Vincent P. McDevitt.*

*Kent H. Brown* argued the cause for Public Service Commission of New York, petitioner in No. 22 and respondent in No. 26. With him on the briefs was *Morton L. Simons.*

*J. Evans Attwell* argued the cause for Ocean Drilling & Exploration Co., petitioner in No. 26 and respondent in Nos. 21, 22 and 32. With him on the briefs were *W. H. Drushel, Jr., J. A. O'Connor, Jr.,* and *H. Y. Rowe.*

*Herbert W. Varner* argued the cause for Superior Oil Co. et al., respondents in Nos. 21, 22 and 32. With him on the brief was *H. H. Hillyer, Jr.*

*Richard F. Generelly* argued the cause and filed a brief for Callery Properties, Inc., respondent in Nos. 21, 22 and 32.

*Paul W. Hicks* argued the cause for Placid Oil Co. et al., respondents in Nos. 21, 22 and 26. With him on the brief were *Robert W. Henderson* and *Thomas G. Crouch.*

*H. H. Hillyer, Jr.,* filed a brief for J. R. Frankel et al., respondents in Nos. 21, 22 and 32.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The Federal Power Commission in 1958–1959 granted unconditional certificates of public convenience and necessity to numerous producers of gas in south Louisiana, the sales contracts of the producers calling for initial prices ranging from 21.4 cents to 23.8 cents per Mcf. After deliveries commenced under those contracts, consumer interests challenged the orders in various courts of appeals. The Court of Appeals for the Third Circuit sustained the Commission's action (*United Gas Improvement Co.* v. *Federal Power Comm'n,* 269 F. 2d 865) but we vacated the judgment (*Public Service Comm'n* v. *Federal Power Comm'n,* 361 U. S. 195) for reconsideration in light of *Atlantic Refining Co.* v. *Public Service Comm'n (CATCO),* 360 U. S. 378; and the other courts of appeals did likewise.[1]

The Commission thereupon instituted an area rate proceeding for south Louisiana and consolidated the re-

---

[1] See *United Gas Improvement Co.* v. *Federal Power Comm'n,* 283 F. 2d 817; *Public Service Comm'n* v. *Federal Power Comm'n,* 109 U. S. App. D. C. 292, 287 F. 2d 146; *United Gas Improvement Co.* v. *Federal Power Comm'n,* 287 F. 2d 159; *United Gas Improvement Co.* v. *Federal Power Comm'n,* 290 F. 2d 133; and *United Gas Improvement Co.* v. *Federal Power Comm'n,* 290 F. 2d 147.

manded cases with that proceeding. 25 F. P. C. 942.
It advised the producers of their potential obligation to
refund any amounts eventually found to be inconsistent
"with the requirements of the public interest and neces-
sity" under § 7 of the Natural Gas Act, 52 Stat. 824, as
amended, 15 U. S. C. § 717f. 27 F. P. C. 15. Later
the Commission in the interest of expedition severed the
present group of applications and set them for a hear-
ing in a consolidated proceeding under § 7. 27 F. P. C.
482. At the end, the Commission imposed two con-
ditions on the certificates granted in these cases. *First,*
it provided that the producers commence service at
18.5 cents per Mcf., plus 1.5 cents tax reimbursement
where applicable, a price that it found to be "in line"
with prices for Commission-certificated sales of gas from
the southern Louisiana production area under generally
contemporaneous contracts, 30 F. P. C. 283, 288–289.
*Second,* it provided that until just and reasonable area
rates are determined for south Louisiana, or until July 1,
1967, whichever is earlier, the producers shall not file any
increased rates above 23.55 cents, the level at which rate
filings might trigger increased rates by other producers
under the escalation provisions of their contracts with
the pipeline companies here involved. 30 F. P. C. 283,
298.

In addition, the Commission ordered the producers to
refund to their customers the amounts in excess of the
proper initial price which they had already collected
under the original certificate. 30 F. P. C. 283, 290.

On review the Court of Appeals held that the Com-
mission erred in limiting producers to an initial "in-line"
price without first canvassing evidence bearing on the
question of what would be a just and reasonable price
for the gas. It further held that the Commission had
no power to place an upper limit on future rates that a
producer might file. Finally, the Court of Appeals, while

upholding the power of the Commission to order refunds, held that the measure of such refunds was not to be the difference between the "in-line" price and the original contract price, but between the latter and the just and reasonable price subsequently to be fixed. 335 F. 2d 1004. We granted certiorari, 380 U. S. 931. We reverse the Court of Appeals.

We think the Commission acted lawfully and responsibly.in line with our decision in the *CATCO* case where we held that it need not permit gas to be sold in the interstate market at the producer's contract price, pending determination of just and reasonable rates under § 5, 52 Stat. 823, 15 U. S. C. § 717d. 360 U. S. 378, 388–391. Rather, we held that there is ample power under § 7 (e),[2] to attach appropriate protective conditions. And see *Federal Power Comm'n* v. *Hunt,* 376 U. S. 515, 524–527. The fixing of an initial "in-line" price establishes a firm price at which a producer may operate, pending determination of a just and reasonable rate, without any contingent obligation to make refunds should a just and reasonable rate turn out to be lower than the "in-line" price. Consumer protection is afforded by keeping the "in-line" price at the level where substantial amounts of gas have been certificated to enter the market under other contemporaneous certificates, no longer subject to judicial review or in any way "suspect." We believe the Commission can properly conclude under § 7 that adequate protection to the public interest requires as an interim measure that gas not enter the interstate market at prices higher than existing levels. To consider in this § 7 proceeding the mass of evidence relevant to the fixing of just and rea-

---

[2] Section 7 (e) provides in part:

"The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

sonable rates under § 5 might in practical effect render nugatory any effort to fix initial prices.[3]   We said in *CATCO* that § 7 procedures are designed "to hold the line awaiting adjudication of a just and reasonable rate" (360 U. S., at 392), and that "the inordinate delay" in § 5 proceedings (360 U. S., at 391) should not cripple them.

The second condition, which temporarily bars rate increases beyond 23.55 cents per Mcf., was likewise aimed at keeping the general price level relatively constant pending determination of the just and reasonable rate. We noted in *Federal Power Comm'n* v. *Hunt, supra,* at 524, that "a triggering of price rises often results from the out-of-line initial pricing of certificated gas" and that the possibility of refund does not afford sufficient protection. And see *Federal Power Comm'n* v. *Texaco Inc.,* 377 U. S. 33, 42–43.   We think, contrary to the Court of Appeals, that there was ample power under § 7 (e) for the Commission to attach these conditions for consumer protection during this interim period though the certificate was not a temporary one, as in *Hunt,* but a permanent one,

---

[3] In the early post-*CATCO* cases, the Commission apparently proceeded on a case-by-case basis, considering whatever evidence might have been presented. See, *e. g., Continental Oil Co.,* 27 F. P. C. 96, 102–108. Experience convinced it that the minimal utility derived from cost and economic trend evidence was outweighed by the administrative burdens and delays its consideration inevitably produced. See *Skelly Oil Co.,* 28 F. P. C. 401, 410–412. The Commission properly and constructively exercised its discretion in declining to consider this large quantity of evidence. To have done so would have required a considerable expenditure of manpower, cf. *Wisconsin* v. *Federal Power Comm'n,* 373 U. S. 294, 313. We have previously encouraged the Commission to devise reasonable means of streamlining its procedures, see *Federal Power Comm'n* v. *Hunt, supra,* at 527, and we regard the Commission's decision here as an appropriate step in that direction.   Cf. *Federal Power Comm'n* v. *Texaco Inc.,* 377 U. S. 33, 44.

as in *CATCO* and *Federal Power Comm'n* v. *Texaco Inc., supra.*

The "in-line" price of 18.5 cents is supported by the contract prices in the south Louisiana area that were not "suspect," and the selection of 23.55 cents beyond which a price increase might trigger escalation reflects the Commission's *expertise.*

We also conclude that the Commission's refund order was allowable. We reject, as did the Court of Appeals below, the suggestion that the Commission lacked authority to order any refund. While the Commission "has no power to make reparation orders," *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591, 618, its power to fix rates under § 5 being prospective only, *Atlantic Refining Co.* v. *Public Service Comm'n, supra,* at 389, it is not so restricted where its order, which never became final, has been overturned by a reviewing court. Here the original certificate orders were subject to judicial review; and judicial review at times results in the return of benefits received under the upset administrative order. See *Securities & Exchange Comm'n* v. *Chenery Corp.,* 332 U. S. 194, 200–201. An agency, like a court, can undo what is wrongfully done by virtue of its order. Under these circumstances, the Commission could properly conclude that the public interest required the producers to make refunds [4] for the period in which

---

[4] The problem of refunds for amounts collected above the "in-line" price is not affected here by any filing under § 4 for increases within the limits of the triggering moratorium. 52 Stat. 822, 15 U. S. C. § 717c. Under § 4 (d), a 30-day notice to the Commission and to the public is required for all rate increases, the Commission having authority under § 4 (e) to suspend the new rate for five months and thereafter to act only "after full hearings." If the Commission has not acted at the expiration of the period of suspension, the new rates become effective. The Commission may require the producer to furnish a bond, and thereafter may compel refund of "the portion of such increased rates or charges by its decision found not justified."

they sold their gas at prices exceeding those properly determined to be in the public interest.

We think that the Commission could properly measure the refund by the difference between the rates charged and the "in-line" rates to which the original certificates should have been conditioned. The Court of Appeals would delay the payment of the refund until the "just and reasonable" rate could be determined. We have said elsewhere that it is the duty of the Commission, "where refunds are found due, to direct their payment at the earliest possible moment consistent with due process." *Federal Power Comm'n* v. *Tennessee Gas Transmission Co.*, 371 U. S. 145, 155. These excessive rates have been collected since 1958; under the circumstances, the Commission was not required to delay this refund further. And the imposition of interest on refunds is not an inappropriate means of preventing unjust enrichment. See *Texaco, Inc.* v. *Federal Power Comm'n*, 290 F. 2d 149, 157; *Philip Carey Mfg. Co.* v. *Labor Board*, 331 F. 2d 720, 729–731.

*Reversed.*

MR. JUSTICE FORTAS took no part in the consideration or decision of these cases.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

While the Commission's expansive view of its powers seems to me largely defensible in the abstract, I believe its actual decision reveals error and unfairness in important respects.

### I.

The price condition, alone of the three key prongs of the Commission's order, can in my view be wholly sustained. The chief challenge to it stems from the exclu-

sion in the § 7 hearing of a mass of cost and supply-demand evidence tendered by producers.[1]  Although the encompassing § 7 standard of public convenience and necessity encourages a broad inquiry, the Commission has given valid reasons for limiting itself to the in-line price for the time being.  Area pricing ultimately aims to simplify proceedings under the statute, but the transition to it is said to strain the Commission's present resources for investigation.  See *Wisconsin* v. *FPC,* 373 U. S. 294, 298–300, 313–314.  The in-line price, comparatively easy to fix, provides a firm basis for producers, helps avoid unrefundable initial overcharges, and exerts a downward pressure on price; at the same time, producers can file increases under § 4 with a six-month delay at most.  The Commission has given a fair trial to cost evidence,[2] and nothing in the offer of proof suggests a supply-demand crisis warranting court intervention with this administrative approach.

In locating the in-line price, the Commission has ignored a number of contemporaneous high-price contracts labeled "suspect" because then under review, disapproved, or deemed influenced by those under review or disapproved.  Although the danger of using a crooked measuring rod demands some precaution, this blanket exclusion also chances some distortion in favor of an unduly low in-line price.  In the main the producers have chosen not to brief this question, apparently under the misapprehension that the Government has not here sought to sustain the exclusion of these contracts or that the lower court's failure to reach the question precluded this Court from doing so.[3]  But while the suspect order rule may by default be abided in this instance, I would

---

[1] Section citations herein are all to the Natural Gas Act, 52 Stat. 821, as amended, 15 U. S. C. §§ 717–717w (1964 ed.).

[2] See the majority's note 3, *ante,* p. 228.

[3] See Petition of the FPC for Certiorari, p. 15, n. 14.

not close the door to future arguments for a different solution of the dilemma.

A last troubling aspect of the in-line price derives from a critical and unusual circumstance: it, like the other conditions in this case, was imposed for the first time on remand, several years after an unconditioned permanent certificate had issued. Presumably for six months hence, producers will be compelled to sell at a price they might not have accepted when free to refuse; for all that appears, the price may even be below cost, let alone a fair profit. However, in general the producers apparently did not seek an option to cancel future sales if dissatisfied by the newly conditioned certificates, the six-month delay is both brief and familiar, and I cannot say the Commission did not have a legitimate interest in imposing the in-line price at the time it did.

## II.

The price-increase moratorium also seems to me a measure not generally beyond the Commission's grasp, but it should not be sustained on the record before us. Recognizing force in the contrary view of the Court of Appeals, I do not believe that § 4 must be read to bestow on producers an invincible right to raise prices subject only to a six-month delay and refund liability. Cf. *FPC v. Texaco Inc.*, 377 U. S. 33; *FPC v. Hunt*, 376 U. S. 515. A freeze until 1967 is not permanent price-fixing, and in this interregnum between individual and area pricing, the hazard of irreversible price increases warrants imposing some brake. A lengthy moratorium—coupled with a refusal to consider cost or supply-demand figures in setting prices for the duration—might present a real risk of choking off supply, but such a case is not before us.

Nevertheless, a moratorium instituted on remand is a hazardous device at best, and the present one is simply not supported by evidence. Because the producers have

no chance to refuse the certificates after commencing delivery, the ceiling may coerce sales at unfairly low prices. Yet while the present moratorium must be endured longer than the in-line price, at least it permits the producers to charge a markedly higher amount; and as the safety valve for a price explosion, the moratorium could be upheld. At this point, however, the Government's argument fails for lack of proof that a price explosion is likely if increases rise above the moratorium figure. The Commission's figure was not considered by its hearing examiner, who made no recommendation for a moratorium. The Commission report itself devotes no more than one conclusory sentence, qualified by a footnote, to the question of what specific price rise will trigger increases at large, 30 F. P. C., at 298; rather than amplifying, the Government brief merely contends that the point has not been adequately preserved under § 19—a contention I do not accept.[4] Several producers state that the Commission's fear of triggering has not been realized although sales are currently being made by them at levels above the intended moratorium price.

## III.

While agreeing that the Commission has power to order refunds in the case before us, I believe the measure of repayment it selected is illogical and harsh. On the initial question of power, it must be conceded that noth-

[4] This precise ground of attack upon the moratorium was set forth by at least one producer. See ODECO Application for Rehearing Before the FPC. R. 603. Applications of other producers argued instead that any moratorium was plainly illegal under the Fifth Circuit's decision in *Hunt* v. *FPC*, 306 F. 2d 334, which had not then been reversed by this Court. 376 U. S. 515. See Petition of Placid Oil et al. for Rehearing Before the FPC, p. 35. Under these circumstances, § 19 does not seem to me to preclude allowing all producers the benefit of the error pinpointed by ODECO.

ing in the statute provides for refunds when a sale has been approved without qualification; but approval in the present instances had not become final for want of judicial review, and an equitable power to order refunds may fairly be implied.

The measure of refunds is another matter. The Commission has now directed that the producers repay the difference between the amounts collected over four to six years and the figure it has now established as the original in-line price.[5] Since the in-line price has been fixed without reference to cost evidence and falls below the opening levels set in the negotiated contracts, the producers may well be receiving less than cost, as some of them expressly claim; and this imposed revision downward of prices covers not six months but a period of years.

The obvious refund formula, implicated by the statute itself and adopted by the Court of Appeals, would call for repayment of all amounts collected in excess of the "just and reasonable" price; that price, measured under §§ 4 and 5, naturally takes due account of costs. The Government retorts that producers have no "right" to sell their gas for a "just and reasonable" price under the statute, a proposition perhaps true in the limited sense that the public convenience and necessity might yet exclude fair-profit sales by a uniquely high cost producer or in the face of a glutted market. No attempt is made, however, to class the present facts with such imaginable situations. Nor is advance exclusion from the interstate

---

[5] Deliveries commenced under all or nearly all the contracts in 1959 at prices exceeding 18.5 cents. The Commission's order directing the in-line price, refunds, and the moratorium issued four years later in 1963, and it has been under judicial review for the past two years. The record does not clearly indicate what rate increases the producers may already have filed with the Commission.

market so fearsome as an unexpected repricing of a completed sale depriving the seller of profit or costs.

On the present facts the Government has failed to point to any public interest overriding the potent claims of the producers to a fair return on their past four to six years of sales. Any triggering caused by the amounts previously charged has already spent its force and cannot be undone. Unconvincingly, the Government implies the producers may be comparatively well off with the present formula because it provides a final figure now and the "just and reasonable" price might prove to be below the in-line price; however, instant certainty as to past prices is no great gain since taxes and royalties have already been paid, and the chance that producers may get more than they deserve by following the in-line price is not a substitute for assuring them a fair return. About the only concrete advantage cited by the Government for the in-line price is that it speeds refunds to consumers. Assuming that a compromise cannot be reached as in other cases,[6] elaborate cost data should become available in the next year or two with the completion of the southern Louisiana area rate proceeding. Consumers, who assuredly expected no refunds when they paid their gas bills as long ago as six years, certainly do not suffer seriously in waiting a bit longer for refunds that individually must be minute in most cases.

The incongruity of the Commission's refund formula is well portrayed by considering what would have happened if the Commission had originally granted the certificates now thought proper by this Court. By accepting certificates conditioning sales at the in-line price, the producers

---

[6] On several occasions, the Commission has approved agreements by producers to refund a fixed fraction of the difference between the amounts collected and the settlement price. See *Texaco Inc.*, 28 F. P. C. 247 (other producers severed from the instant case); *Continental Oil Co.*, 28 F. P. C. 1090 (on remand from *CATCO*).

could immediately have filed for increases, suffering at most a six-month delay. Even if the Commission's moratorium survived, the ceiling during this four-to-six-year period would have been 23.55 cents rather than the 18.5-cent figure now imposed. Thus, even had the Commission not erred in the first instance in favor of the producers, they still could have collected payments well in excess of 18.5 cents subject only to the ultimate finding of a "just and reasonable" price now denied them by the Commission.

In line with the foregoing discussion, I would uphold the Commission's decision fixing an in-line price, remand the case for further findings on the triggering price for a moratorium if the Commission wishes to pursue the point, and set aside the refund with leave to order repayments based on the "just and reasonable" price.